UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

LIONEL GARY SIROIS,

                Petitioner,                Case No. 1:08-cv-106

v.                                      Honorable Janet T. Neff

CARMEN PALMER,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254. Petitioner is serving a term of 11 years and 2 months to 25 years, imposed on April 5, 2006
by the Delta County Circuit Court after Petitioner was convicted of assault with intent to do great
bodily harm less than murder, MICH. COMP. LAWS § 750.84.[1] His sentence was enhanced by his
status as a fourth habitual offender, MICH. COMP. LAWS § 769.12. In his *pro se* petition, Petitioner
raises seven grounds for relief, as follows:

> I.        THE ADMISSION OF EVIDENCE OF MR. SIROIS'S BAD CHARACTER
> VIOLATED THE COURT RULES AND DEPRIVED HIM OF HIS STATE
> AND FEDERAL CONSTITUTIONAL RIGHTS TO BOTH A FAIR TRIAL
> AND EFFECTIVE ASSISTANCE OF COUNSEL.

> II.       THE COURT'S FAILURE TO ORDER THE LESSER OFFENSE OF
> ASSAULT WITH A DANGEROUS WEAPON DENIED MR. SIROIS HIS
> CONSTITUTIONAL DUE PROCESS RIGHT TO A FAIR TRIAL.

---

[1]Petitioner also was convicted of misdemeanor assault and battery, MICH. COMP. LAWS § 750.81, for which he
was sentenced to a term of 93 days. Petitioner was not in custody for that offense when he filed his petition.

III.   IMPERMISSIBLE TESTIMONY BY NEVER QUALIFIED EXPERTS IMPROPERLY CORROBORATED THE PROSECUTOR'S THEORY OF THE CASE, THEREBY DENYING MR. SIROIS HIS CONSTITUTIONAL DUE PROCESS RIGHT TO A FAIR TRIAL.

IV.   [MR. SIROIS] MUST BE RESENTENCED, WHERE THE GUIDELINES WERE SCORED IMPROPERLY.   TRIAL COURT IMPROPERLY SCORED 30 POINTS FOR PRV 2 BASED ON FOUR LOW SEVERITY FELONY CONVICTIONS CONSISTING OF [SIC] 05/07/91 WHICH VIOLATES THE STATUTE OF MICHIGAN 10 YEAR GAP RULE. HERE THE STATE SCORES MR. SIROIS AT 30 POINTS FOR PRV-2 WHICH SHOULD BE SCORED AT 20 POINTS.

V.   [MR. SIROIS] MUST BE RESENTENCED, WHERE THE GUIDELINES WERE SCORED IMPROPERLY.   TRIAL COURT IMPROPERLY SCORED PRV-5 AT 15 POINTS FOR MISDEMEANORS THAT VIOLATE THE TENTH YEARS GAP RULE.  ALSO POINTS WERE SCORED ON MISDEMEANORS WHERE DEFENDANT HAD NO LEGAL REPRESENTATION, NOR DID THE DEFENDANT WAIVE THAT RIGHT TO COUNSEL.

VI.   [MR. SIROIS] MUST BE RESENTENCED BASED ON OV 9 WHERE IT WAS SCORED 10 POINTS AS THERE WERE TWO VICTIMS IN THIS OFFENSE, ONE WAS STABBED, THE OTHER WAS BITTEN WHEN THERE WAS AN ATTEMPT TO SECURE THE KNIFE BY THE SECOND VICTIM.  TRIAL COURT SENTENCED MR. SIROIS TO ONE COUNT OF [ASSAULT WITH INTENT TO DO GREAT BODILY HARM LESS THAN MURDER] AND ONE COUNT OF [ASSAULT AND BATTERY].  THE TRIAL COURT USED THE LOWER OFFENSE TO ENHANCE DEFENDANT[']S SENTENCE. OV 9 SHOULD BE SCORED 0 POINTS BASED ON ONLY ONE VICTIM IN THE CHARGE OF ASSAULT WITH INTENT OF [SIC] GREAT BODILY HARM LESS THAN MURDER.

VII.   MR. SIROIS IS ENTITLED TO BE RESENTENCED, UNDER THE UNITED STATES SUPREME COURT'S RECENT DECISIONS IN *BLAKELY V. WASHINGTON*, 542 U.S. 296; 124 S. CT. 2531; 159 L. ED. 2D 403 (AN[D] THE SIXTH AND FOURTEENTH AMENDMENT[S] OF THE UNITED STATES CONSTITUTION.[)]

Respondent has filed an answer to the petition (docket #6) arguing that the grounds should be denied. Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit. Accordingly, I recommend that the petition be denied.

## **Procedural History**

### A.    Trial Court Proceedings

The state prosecution arose from an incident that occurred in Escanaba on July 24, 2005, in which Petitioner was accused of stabbing one person with a knife and biting another. Petitioner was bound over on charges of assault with intent to murder and aggravated assault. Petitioner was tried before a jury on February 15-17, 2006.[2]    The trial evidence relevant to Petitioner's habeas claims is summarized below.

Escanaba Public Safety Officer Anthony LaPlant testified that he, Officer Gudwer, and Lieutenant Vanderlinden came into contact with Petitioner at the Delft bar at 1:00 a.m. on July 24, 2005.  (Tr. II, 36-37.)  Petitioner was wearing a blue and white checkered shirt.  (Tr. II, 38.) LaPlant talked to Petitioner about a complaint and obtained his consent for a pat down search.  (*Id.*) LaPlant found a small folding knife in a sheath on the right side of Petitioner's belt.  (Tr. II, 39, 44.) LaPlant removed the knife and handed it to another officer while he completed the search.  (Tr. II, 39.)  LaPlant also found a cell phone with a bent antenna in one of Petitioner's pant pockets.  (Tr. II, 40.)  According to LaPlant, Petitioner had been drinking, but did not exhibit any signs of intoxication. (Tr. II, 40-41.)  The officers did not arrest Petitioner; they returned his knife and called

---

[2]The trial transcripts will be cited as follows:

Tr. I     Jury Trial Volume I, February 15, 2006 (docket #13)
Tr. II    Jury Trial Volume II, February 16, 2006 (docket #14)
Tr. III   Jury Trial Volume III, February 17, 2006 (docket #15)

a taxi to take him home because he was banned from the bar. (Tr. II, 41-42, 44.) Later that night, LaPlant heard about a stabbing incident over the police radio. (Tr. II, 42.) Petitioner became a suspect in the stabbing because the perpetrator had dropped a cell phone with a bent antenna at the scene of the crime. (Tr. II, 42-43.) LaPlant testified that the appearance of Petitioner's hair and beard was different at trial. In addition, Petitioner, who was wearing glasses at trial, was not wearing glasses on the night of the incident. (Tr. II, 43.)

Escanaba Public Safety Officer John Gudwer testified that he was present at the Delft bar when Officer LaPlant conducted the pat down search of Petitioner. (T. I, 47.) LaPlant handed the knife to Gudwer during the search. (*Id.*) Petitioner was wearing a white shirt with dark stripes and black shoes with silver trim. (Tr. II, 57-58.) He did not appear to be intoxicated. (Tr. II, 48.) The officers cleared the scene at the Delft and went to take action on the information they received from Petitioner. (Tr. II, 49.) Later that night, Gudwer responded to the scene of a stabbing. (Tr. II, 50.) The description of the shirt worn by the stabbing suspect matched the shirt Petitioner was wearing at the Delft bar. Gudwer also recalled that Petitioner had a knife at the Delft. (*Id.*) When Gudwer went to Petitioner's residence, he heard a whistle and stopped his car. Petitioner approached Gudwer and told him that he was involved in a fight. (Tr. II, 51.) Petitioner had blood on his face and was wearing a different shirt than he had been wearing earlier at the Delft. (*Id.*) Gudwer later participated in a search of Petitioner's residence in his capacity as an evidence technician. (Tr. II, 52.) During the search, Sergeant Howell found a knife and sheath on the bed. (Tr. II, 53-56.)

Robyn Casey testified that she had worked at Wal-Mart for seven years. She was friends with Jeff Olsen and Kelly Marenger, who also worked at Wal-Mart. (Tr. II, 65.) After working the 4:00 to 11:00 p.m. shift on July 23, 2005, Casey went to a gathering at Marenger's

apartment. (Tr. II, 67.) Several other people were there, including Jeff Olsen, Mike Wilbee and Kim Jackomino. (*Id.*) They were drinking alcohol and listening to music. (Tr. II, 68.) Casey had several rum and Cokes before they left Marenger's apartment around midnight and walked to the Delft bar. (Tr. II, 69, 110.) Casey had one drink at the Delft and that was her last drink of the night. (Tr. II, 111.) About forty-five minutes later, Casey, Marenger, Olsen and Jackomino left the Delft and went across the street to Twisters. (Tr. II, 71.) Fifteen minutes later, Casey's friend, Tonya, picked up Casey, Marenger and Olsen and took them to the Stardust. (Tr. II, 72.) When they arrived at the Stardust, Casey noticed that Marenger was stumbling and kept a close eye on her. (Tr. II, 72-73.) Olsen seemed fairly sober. (Tr. II, 73.) They stayed at the Stardust from 1:30 a.m. until it closed at 2:00 a.m. (*Id.*) While they were at the Stardust, Casey saw Petitioner dancing with Marenger. Casey started dancing with Marenger because she did not want Petitioner to take advantage of Marenger's condition. (Tr. II, 74, 115.) At the end of the night, Petitioner asked Casey if she would dance with him to a slow song and she replied, "No, thank you." (Tr. II, 75.) Petitioner said "okay" and walked away. (Tr. II, 76.)

Casey left the Stardust with Marenger and Olsen. (Tr. II, 76.) When they walked out, Petitioner was talking on his cell phone and asked them if he could get a ride. They told him that they were walking. (Tr. II, 77.) The three of them walked with Marenger in the middle so Casey and Olsen could support her. As they walked toward Marenger's house, they noticed that Petitioner was walking behind them. (Tr. II, 77-78.) Petitioner was close enough that they could hear his phone conversation. (Tr. II, 78.) At one point when Petitioner said that he was by the Hong Kong Buffet, Marenger turned around and corrected Petitioner by saying that they were actually by the Taystee Bakery. (Tr. II, 78, 120-22.) As Petitioner got closer, he was still on his phone and Casey

heard him say, "I have to do something first." (Tr. II, 79.)  Shortly after that, Olsen turned around and asked Petitioner, who was about four feet away from them, "Are you still on your phone?" (*Id*.) At that point, Petitioner tossed the phone on the ground and rushed Olsen. (Tr. II, 80-81.) Petitioner tried to punch Olsen and they ended up wrestling on the ground.  (Tr. II, 82, 126-27.)  Casey tried to break them apart, but was unsuccessful.  Petitioner eventually got up, stepped back from Olsen and took a knife out of his right pocket. (Tr. II, 93.)  Casey could not recall how Petitioner opened the knife, but she saw the blade. (Tr. II, 95.)  Casey saw Petitioner stab Olsen in the right abdomen. (Tr. II, 95.)  The next thing she knew, Casey was on the ground between Petitioner and Olsen wrestling for the knife. (Tr. II, 97.)  During the course of the struggle, Petitioner leaned over and bit Casey's left arm. (Tr. II, 98.)  Casey reached for her phone, which was clipped to her hip, and called 911. (Tr. II, 99.)  At that point, Petitioner had possession of the knife.  He backed away a step or two, said "Back off, bitch," and then ran away. (Tr. II, 99-100.)

Casey applied pressure to Olsen's stab wound for several minutes while they waited for help to arrive. (Tr. II, 101.)  In addition to the stab wound in Olsen's right abdomen, Casey later noticed that Olsen had a second injury on his left side rib area. (Tr. II, 133.-34)  Casey testified that Olsen did nothing to provoke Petitioner. (Tr. II, 103-104.)  Casey described the assailant to police as about 5' 7" tall, later thirties or early forties, light reddish brown hair and wearing a white polo shirt with stripes. (Tr. II, 103.)  Casey identified Petitioner as the assailant, but said that he looked a lot different at the time of trial. (Tr. II, 75.)  She testified that at the time of the incident, Petitioner only had a mustache, his hair was lighter in color and he was not wearing glasses. (*Id*.)

Dr. Guy Jeanblanc testified that he treated Olsen at St. Francis hospital on July 24, 2005. (Tr. II, 158.)  Olsen had one wound on his right flank and a second wound on the left side of

his chest.  (Tr. II, 160.)  He also had a wound on his right hand in the space between his thumb and pointer finger, which Jeanblanc characterized as a defensive wound.  (Tr. II, 160-61.)  Olsen was lucid and told Jeanblanc that a man attacked him and stabbed him multiple times with a knife that had a three to four-inch blade.  (Tr. II, 159.)  Jeanblanc performed surgery to stop the bleeding and repair the damage caused by the knife, which included a cut that went all the way through Olsen's liver and a laceration of the kidney.  (Tr. II, 164-170.)  According to Jeanblanc, the knife penetrated at least six inches to create the injuries to Olsen's liver and kidney.  (Tr. II, 179.)  Thus, if the knife had a four-inch blade, force was used to push the blade another two inches into the body.  (Tr. II, 192-93, 195, 202.)  Jeanblanc testified that a deep wound could be caused by falling on a fixed object, but he did not believe that the stab wound to the abdomen in this case was consistent with someone falling.  (Tr. II, 177, 196-97, 200-201.)  The stab wound to Olsen's chest did not penetrate below the rib level.  (Tr. II, 197-99.)  Jeanblanc estimated that Olsen lost five to eight units of blood as a result of his injuries and could have died without immediate medical treatment.  (Tr. II, 163-64.)

David Stephens, a forensic scientist at the Michigan State Police crime lab in Marquette, examined a Schrade Old Timer single blade folding knife in connection with this case.  (Tr. II, 208-213.)  He found a blood stain in the crevice where the blade folds back into the handle.  (Tr. II, 213.)  The shape and location of the stain led Stephens to believe that at least the handle portion of the knife had been wiped clean.  (Tr. II, 214, 216.)  Stephens sent the blood sample from the knife to Lansing for DNA testing.  (Tr. II, 214.)  According to the report from the lab in Lansing, the blood sample taken from the knife did not match Jeff Olsen's DNA.  (Tr. II, 218.)

Kelly Marie Acha, formerly Kelly Marie Marenger, testified that several people from work came over to her house on the evening on July 23, 2005, including Jeff Olsen and Robyn

Casey. (Tr. II, 223.) Over the course of night, Marenger drank seven or eight drinks, including beer and Captain Morgans and Cokes. (Tr. II, 236.) Marenger was intoxicated by the time she reached the Stardust. (Tr. II, 227.) She did not recall seeing Petitioner until after she, Casey and Olsen left the Stardust. (Tr. II, 228.) Marenger walked between Casey and Olsen, who were helping to guide her because she was staggering. (Tr. II, 243.) Marenger testified that Olsen also was intoxicated. (Tr. II, 245.) As they were walking to Marenger's house, she heard someone talking on a cell phone. Marenger turned around and saw Petitioner. (Tr. II, 229.) She heard Petitioner tell the person on the phone that he was near Hong Kong Buffet and corrected him by saying that they were near the Taystee Bakery. (*Id.*) As they continued to walk, Marenger heard Olsen ask Petitioner if he was still on the phone. (Tr. II, 230, 246-47.) Marenger did nor recall any other conversation between the two men. The next thing she knew, Petitioner came at Olsen and they were down on the sidewalk wrestling. (Tr. II, 231.) Marenger could not remember much about the fight, but she recalled that Casey tried to break them up and they ended up in the middle of Ludington Street. (*Id.*) Marenger then heard Casey scream, "He's stabbing him." (Tr. II, 232.) Marenger flagged down a passing car and called 911. (*Id.*) Marenger did not see the knife, nor did she see Petitioner stab Olsen. (Tr. II, 253.) Marenger found a cell phone on the ground that turned out to be Petitioner's. (Tr. II, 233, 250.) Marenger described the assailant to police as wearing a white button-down shirt with stripes. (Tr. II, 233.)

Escanaba Public Safety Lieutenant Kenneth VanderLinden testified that, on the night of the incident, he first had contact with Petitioner at the Delft bar. (Tr. III, 9.) VanderLinden was there in a supervisory capacity and did not have any direct contact with Petitioner. Later that night, VanderLinden was the first officer to respond to the scene of the stabbing. (Tr. III, 10.) He

discovered the victim lying in the left lane with two women trying to assist him. (*Id*.) VanderLinden got a description of the suspect and reported it over the police radio. (Tr. III, 17.) Officer Gudwer responded that Petitioner was wearing a shirt that matched that description earlier that night at the Delft bar. Gudwer also reported that Petitioner had a sheathed knife on his hip when he was at the Delft. (Tr. III, 17-18.) Officer LaPlante further reported that Petitioner had a Nokia cell phone with a bent antenna like the one that was found at the crime scene. (Tr. III, 18-20.)

After Olsen was taken to the hospital, VanderLinden transported the two women to the department of public safety. (Tr. III, 23.) Thereafter, he went to Petitioner's apartment. When he arrived, Officer Gudwer and Sergeant Howell already had made contact with Petitioner on the street in front of his apartment. (Tr. III, 24.) As they were escorting Petitioner into his apartment, VanderLinden observed blood smears on the wall of the stair well. (Tr. III, 25.) Petitioner gave a statement to Sergeant Howell and signed a consent to search. (Tr. III, 25-26.) Petitioner cooperated with the officers and showed them a bloody towel in the trash can and a shirt with dark stripes wadded up in the corner of the bathroom. (Tr. III, 26.) Petitioner also showed them a pair of jeans he was wearing earlier that evening that had blood on them. (Tr. III, 27.)

Escanaba Public Safety Sergeant David Howell testified that he arrived at Petitioner's house at the same time as Officer Gudwer. Howell was familiar with Petitioner because Howell lived just two doors down from him. (Tr. III, 42.) As Howell was approaching the house, he heard someone whistling in the yard. As Howell stopped and got out of his car, Petitioner approached him. (Tr. III, 43.) He was wearing a blue tank top and denim shorts. Howell observed that Petitioner had a small cut on the bridge of his nose and blood on his face, forearms and hands. (*Id*.) Howell asked Petitioner to lie down on the street so that he could be patted down and handcuffed. Petitioner was

very excited and talking very loudly about what had occurred. (Tr. III, 44.) He told the officers that he had been walking home on Ludington Street behind a man and two women. He claimed that the three people told him to back away because he was walking too close to them. Petitioner stated that he backed approximately ten steps away from them, and when he turned around, the man punched him in the face. (*Id.*) Petitioner told Howell that he was scared for his life. (Tr. III, 64-65.)

Howell suggested that they go inside Petitioner's apartment so they would not disturb the neighbors at 3:00 a.m. (Tr. III, 44.) As they walked up the inside stairwell to Petitioner's apartment, Howell observed blood smears on the wall and droplets of blood on the carpet. (Tr. III, 45.) Howell read Petitioner his *Miranda* rights and asked him to sign a consent to search form for his apartment. (*Id.*) Because the description of the suspect's clothing given over the police radio did not match what Petitioner was wearing, Howell asked to see the clothing he was wearing earlier that night. (Tr. III, 46.) Petitioner took Howell into the bathroom off the kitchen where Howell saw bloody towels in the trash can, blood spatters in the sink and a white polo shirt with dark stripes on the floor. (*Id.*) When Howell asked Petitioner about his pants, Petitioner took him to a bedroom and showed him a pair of jeans that appeared to have blood on them. (Tr. III, 46, 67.) Petitioner told Howell that when he pulled the knife, the man who punched him in the face took it away from him, so he no longer had the knife in his possession. (Tr. III, 47.)

A search warrant was obtained for Petitioner's apartment, which was executed by Howell and Officer Gudwer. (Tr. III, 47-48.) Howell testified that the officers took photos and then bagged the evidence. (Tr. III, 48-49.) In the course of the search of Petitioner's bedroom, they found a blue bath towel at the foot of the bed that had blood on it. They lifted up the towel and found a black nylon knife sheath and a green-handled knife. (Tr. III, 50.) Officer Gudwer

recognized the knife from his encounter with Petitioner at the Delft bar. Howell saw flecks of blood on the green handle. When he opened the knife, he observed water droplets on the blade and that the tip of the blade was bent. (Tr. III, 50, 55.)

Jeff Olsen testified that he went over to Marenger's apartment for a get-together at about 9:00 p.m. on Friday, July 23. (Tr. III, 72.) Olsen brought a twelve-pack of Miller Light, which he shared with his friends. (Tr. III, 98-99.) Olsen had his first beer around 10:00 p.m. He could not recall if he had another beer before leaving Marenger's apartment for the Delft bar at around midnight. (Tr. III, 75, 99.) After Olsen drank five or six Miller Lights at the Delft, he and Mike left and walked down to Baron's. (Tr. III, 76.) They stayed at Baron's for a short time and then met up with the rest of the group at Twisters. Olsen may have had a couple more beer by the time they left Twisters. He was feeling buzzed, but did not consider himself intoxicated. (Tr. III, 76-78.) They arrived at the Stardust at around 1:30 a.m. (Tr. III, 78.) Olsen had one more beer at the Stardust, which gave him a total of ten or eleven for the night. (Tr. III, 78-79, 125.) Olsen did not recall seeing Petitioner while they were at the Stardust. (Tr. III, 79.) Olsen, Casey and Marenger left the Stardust at closing and walked down the sidewalk on Ludington Street toward Marenger's apartment.

As they came out of the bar, Olsen noticed Petitioner talking on a cell phone. Petitioner looked over at them and said, "Okay, but I got to take care of something first." (Tr. III, 80.) Petitioner closed his phone and watched them walk by. (*Id*.) As Olsen, Casey and Marenger walked down the street, Olsen looked over his shoulder and noticed Petitioner about ten feet behind them with his phone to his ear. Olsen testified that he looked back a couple more times as they continued to walk and noticed that Petitioner was getting closer to them, which made him nervous. (Tr. III, 81.) When Olsen saw that Petitioner was right up behind them, he said to the girls, "I think

he's following us." (Tr. III, 83.)  Olsen then turned to Petitioner and jokingly said, "Are you still on

the phone, brother?"  According to Olsen, Petitioner responded, "You just said the wrong thing to

the wrong guy at the wrong time," and then charged him.  (*Id.*)  The two men wrestled, but Petitioner

did not recall either one of them throwing punches.  (Tr. III, 84, 121.)  Olsen got Petitioner into a

headlock and said, "Okay, I'll tell you what, I'll let you go and you go your way, we'll go ours, and

this night's over.  This doesn't need to go any further."  (Tr. III, 84, 121-22.)  When Petitioner

responded, "All right," Olsen let him go.  (Tr. III, 84.)

Olsen testified that Petitioner backed up about five feet and said, "That's the biggest

mistake you're ever going to make in your life."  (Tr. III 85.)  Petitioner then reached down toward

his waist with his right hand and pulled a knife.  Petitioner opened the knife and charged Olsen with

the knife in his left hand.  (Tr. III, 86.)  Petitioner attacked Olsen so quickly that he did not have an

opportunity to flee.  Olsen looked down and saw the knife in him with Petitioner's left hand on the

knife handle.  (Tr. III, 87.)  Olsen swatted the knife away and then staggered backward into

Ludington Street and fell on his back.  (Tr. III, 87-88.)  Petitioner was kneeling over Olsen with the

knife in his right hand.  Olsen reached up with his right hand and grabbed the knife blade, which cut

the web of his hand.  (Tr. III, 88-89, 129.)  At that point, Casey tackled Petitioner and got on top of

him.  (Tr. III, 89.)  Olsen heard Casey scream, but did not see Petitioner bite her.  (Tr. III, 89.)

Olsen testified that he never had Petitioner on his back and never punched him in the

face.  (Tr. III, 94.)  Olsen further stated that he did not have any other conversation or make any

further statements to Petitioner.  (Tr. III, 94-95.)  Over defense objection, Olsen showed the jury

where he had been stabbed.  (Tr. III, 96-97.)  Olsen was 5' 8 ½ " tall and weighed 165 pounds at the

time of the incident.  (Tr. III, 74.)  Olsen identified Petitioner as the man who stabbed him.  He

- 12 -

further testified that Petitioner looked different at trial than he did at the time of the attack. (Tr. III, 90.)

Petitioner testified in his own defense. Petitioner was out by himself on the night of July 23, 2005. (Tr. III, 148, 171-72.) He had a conversation with police officers around midnight at the Delft bar. (Tr. III, 149.) A police officer held his knife while they checked him out, but then returned the knife to him. (Tr. III, 149-50.) When Petitioner left the Delft around 12:30 p.m., he took a cab to the Stardust. (Tr. III, 150.) He had a couple of mixed drinks and danced. (*Id.*) When Petitioner left the Stardust, he got out his cell phone and tried to call a friend of his who was driving from Marquette. (Tr. III, 152.) During the call, Petitioner told his friend that he had to go home and check on his son. (*Id.*) Petitioner started to walk quickly toward his home, which was only four or five blocks away. (Tr. III, 153.) Petitioner could see people in front of him and thought they seemed heavily intoxicated. (*Id.*) As Petitioner got close to them, he heard conversation among them. One of the girls said, "This guy is following us" and Olsen said something like, "Put some distance between us." (Tr. III, 154.) Petitioner perceived Olsen's statement as a threat and he turned around and walked back six to eight steps without saying anything. (Tr. III, 172-73.) When Petitioner turned back around, Olsen punched him right in the nose, which resulted in a cut at the bridge of his nose. (Tr. III, 156, 173-75.) Petitioner fell backward and caught himself on his right palm, which was painful because he underwent carpel tunnel surgery two weeks before. (Tr. III, 157, 171.) According to Petitioner, Olsen continued to punch him in the head and put him in a choke hold. (Tr. III, 158.) Petitioner was afraid that he was going to lose consciousness from being choked, so he started to pull his knife out with his right hand. (*Id.*) Petitioner claims that he was unable to open the knife with his injured right hand. (Tr. III, 182.) By that point, Olsen and one of the girls were

trying to get the knife away from him. (Tr. III, 160.) He did not know how the knife got opened or how Olsen got stabbed. (Tr. III, 160-61.) Petitioner never intended to stab Olsen and was not aware that he had been stabbed until later. (Tr. III, 161, 176.) Petitioner was so disoriented from being choked, that he had difficulty getting up. He tried to run away, but could not run very far and ended up walking. (Tr. III, 162.) Petitioner fled the scene because he wanted to get home and talk to his son before he talked to the police. (Tr. III, 166-67.)

When Petitioner got home, he did not want his son to see him with blood all over him, so he went into the bathroom, took off his bloody shirt and washed his face. (Tr. III, 162-63.) He then went to his bedroom, where he took off his pants and put on shorts and a tank top. (Tr. III, 162-63.) To remove his pants, Petitioner took off his belt and knife sheath, which contained his knife. Petitioner rinsed off his knife. (Tr. III, 168.) While he was changing Petitioner realized his phone was missing from his pant pocket. (Tr. III, 163.) When Petitioner heard sirens, he went outside and whistled down a police car. (Tr. III, 164, 167.) Petitioner admitted to telling police that he no longer had the knife, but explained that he was still in a very scared and frantic state and could not clearly recall what had happened. (Tr. III, 169-71, 176.) Petitioner also admitted that in 2000 he was convicted of the felony of grand theft in the State of Florida. (Tr. III, 184.)

Petitioner testified that he had a mustache at that time of the incident, but had a full beard at the time of trial because it was difficult to get a razor at the jail. (Tr. III, 147, 166.) Petitioner also had a different hairstyle because there was not a barber at the jail. (Tr. III, 166.) Petitioner was wearing glasses at trial, but was not wearing glasses on the night of the incident. (Tr. III, 166.) Petitioner explained that he needed glasses to read. (Tr. III, 147.) Petitioner weighed over 190 pounds at the time of trial, but claimed that he weighed about 176 pounds at the time of the

incident. (Tr. III, 147-48, 177.) Petitioner disputed the accuracy of medical records stating that he weighed 213 pounds on March 9, 2005, which was about four and half months before the incident. (Tr. III, 179-81.)

At the conclusion of trial, on February 17, 2006, the jury found Petitioner guilty of the lesser offenses of assault with intent to commit great bodily harm less than murder and assault and batter. (Tr. III, 251-52.) On April 5, 2006, Petitioner was sentenced to serve a term of 15 to 22½ years as an habitual offender. (Sentencing Transcript, (S. Tr.), 23-24, docket #16.)

## B.     Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on August 7, 2006, raised the first three claims presented in his habeas corpus petition. (See Def.-Appellant's Br. on Appeal, docket #17.) On October 12, 2006, Petitioner filed a supplemental *pro se* appellate brief raising the remaining four claims presented in his application for habeas corpus relief. (See Standard-4 Br. on Appeal, docket #17.) By unpublished opinion issued on May 17, 2007, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (See 5/17/07 Mich. Ct. App. Opinion (MCOA Op.), docket #17.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same seven claims raised before and rejected by the Michigan Court of Appeals. By order entered November 29, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #18.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

<u>Discussion</u>

A.     **Procedural Default**

The Michigan Court of Appeals found several of Petitioner's claims to be unpreserved because he failed to raise objections at trial. Consequently, the court of appeals reviewed those claims only for plain error. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547

U.S. 518, 536 (2006). However, federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999). Accordingly, I will proceed to the merits of Petitioner's claims.

B.     **Ground I:  Evidence of Bad Character**

In Ground I, Petitioner claims that the admission of evidence of his bad character violated the Michigan Rules of Court and deprived him of a fair trial. First, Petitioner claims that the prosecutor improperly elicited testimony from police officers regarding an encounter they had with Petitioner at the Delft bar hours before the stabbing. Second, Petitioner argues that the prosecutor elicited testimony from several witnesses regarding changes in Petitioner's hairstyle, facial hair, use of glasses and body weight, which required Petitioner to reveal the fact that he had spent time in jail awaiting trial. Petitioner contends that the impact of the evidence was devastating considering the credibility contest between Petitioner and prosecutorial witnesses over the events that resulted in the stabbing. Petitioner argues that without evidence that he had been involved in

an earlier incident at the Delft bar, spent time in jail and voluntarily changed his appearance, the jury may have acquitted him on the charge of assault with intent to murder rather than finding him guilty of the lesser charge of assault with intent to commit great bodily harm less then murder. Petitioner also raises two related claims of ineffective assistance of counsel.

The Michigan Court of Appeals concluded that no plain error occurred, stating:

On appeal, defendant alleges error in the admission of testimony that he contends should have been excluded from his trial under MRE 404(b) . . . . Because defendant did not object to the admission of this evidence at trial, we review these claims for plain error affecting his substantial rights. *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004). To prevail, defendant must identify evidentiary errors that were plain or obvious, and demonstrate that those errors affected the outcome of the trial. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). As explained below, defendant has failed to make the requisite showing.

First, the admission of evidence that defendant had been banned from a local bar only a few hours before the assaults was not error, plain or otherwise. The testimony provided the background from which the police explained their ability to identify defendant as a suspect. This evidence was a significant aspect of the chronicle of the night's events. Evidence of chronologically related events involving other wrongs is not precluded under MRE 404(b)(1) if the evidence is necessary to allow the jury to hear the "complete story" of the case. *People v Sholl*, 453 Mich 730, 741-742; 556 NW2d 851 (1996), quoting *People v Delgado*, 404 Mich 76, 83; 273 NW2d 395 (1978).

Defendant has similarly failed to show that the admission of testimony concerning the manner in which his appearance had changed while he was in jail awaiting trial constitutes plain error warranting relief. Defendant points to nothing plainly erroneous or unduly prejudicial about the testimony that his appearance had changed since the time of the assaults. Furthermore, defendant himself made the first reference at trial to his jail term, when he explained that he had a beard because "in the jail, you can't hardly ever get a razor." *See People v Griffin*, 235 Mich App 27, 46; 597 NW2d 176 (1999) ("error requiring reversal cannot be error to which the aggrieved party contributed by plan or negligence"). Defendant's assertion that his trial counsel was ineffective for having elicited such testimony is not supported by the record, which reveals that defendant volunteered the testimony at issue without any specific prompting by counsel. In any event, defendant has failed to demonstrate that reference to his jail status affected the outcome of the case. *People v Harmon*, 248 Mich App 522, 531; 640 NW2d 314 (2001) (to prevail on a claim of ineffective

assistance of counsel, defendants must show that, but for the attorney's error, a different outcome reasonably would have resulted). Thus, given that the testimony challenged on appeal was properly admissible or did not otherwise prejudice defendant, defendant's claim that his counsel was ineffective for failing to object or otherwise challenge the testimony at issue fails. *Id.*; *see also People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001) ("[a] trial attorney need not register a meritless objection to act effectively").[1]

> 1 Defendant also argues that counsel was ineffective for having failed to request a mistrial after the trial court sustained objections to the elicitation of other "bad character" evidence. This argument, however, is waived because it was not raised in defendant's statement of questions presented, as required by MCR 7.212(C)(5), and fails to address with any substance or citation to authority the merits of such a request. *People v Miller*, 238 Mich App 168, 172; 604 NW2d 781 (1999); *see also People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004) ("[a]n appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue").

(MCOA Op. 1-2.)

Petitioner claims that the admission of evidence of his bad character violated the Michigan Rules of Court and deprived him of a fair trial. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh*

*v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

The admission of evidence concerning Petitioner's interaction with Officers LaPlant, Gudwer and VanderLinden at the Delft bar did not deprive Petitioner of a fundamentally fair trial. As explained by the Michigan Court of Appeals, Petitioner's interaction with police at the Delft bar was an integral part of night's events. The police officers who interacted with Petitioner at the Delft immediately identified Petitioner as a suspect in the stabbing because the description of the stabbing suspect's clothing, knife and phone matched what they observed at the Delft. Furthermore, any risk of prejudice was minimized because the officers did not arrest Petitioner or disclose the nature of the complaint that they were investigating at the Delft.

Likewise, Petitioner was not denied a fair trial as a result of testimony concerning the change in his appearance. The prosecutor elicited testimony from witnesses concerning changes in Petitioner's hairstyle, facial hair, use of glasses and body weight. (Tr. II, 43, 75; Tr. III, 90.) On direct examination of Petitioner, defense counsel asked Petitioner if he had a beard at the time of the stabbing. (Tr. III, 147.) Petitioner responded that he had more facial hair at the time of trial because ". . . in the jail, you can't hardly ever get a razor." (Tr. III, 147.) When defense counsel asked Petitioner about the change in his weight, Petitioner similarly explained that he had gained weight as the result of his incarceration. (Tr. III, 147-48.) The prosecutor further questioned Petitioner on cross-examination regarding changes in his facial hair, use of glasses and weight. (Tr. III, 177-181.) Petitioner again commented, "There's no barber at the jail." (Tr. III, 166.) Petitioner's identity as the person who stabbed Olsen was not at issue in the case. Nevertheless, Petitioner contends that he was prejudiced by the testimony because he was forced to explain that the changes in his

appearance were the result of his incarcerated while awaiting trial.  As noted by the Michigan Court of Appeals, Petitioner made the first reference at trial to the fact of his incarceration.  Furthermore, given the nature and seriousness of the charges against Petitioner, which included assault with intent to commit murder, a reasonable person would assume that he was held in jail pending trial.  Accordingly, Petitioner is not entitled to habeas corpus relief resulting from this evidence, which cannot reasonably be deemed "bad character evidence" or even mildly prejudicial.

Petitioner raises two related claims of ineffective assistance of counsel.  Petitioner first claims that his trial counsel was ineffective for failing to object to the evidence of bad character, failing to request a curative instruction and for eliciting that his client was in jail to explain the change in Petitioner's appearance.  Second, Petitioner contends that defense counsel was ineffective for failing to request a mistrial after the trial court sustained two objections regarding evidence of bad character.[3]  The trial court sustained defense counsel's objection to evidence elicited by the prosecutor from Officer Gudwer that there was an arrest warrant for Petitioner's wife.  (Tr. II, 48-49.)  The trial court also sustained an objection to Sergeant Howell's testimony that he had talked to Petitioner concerning past investigations.  (Tr. II, 42-43.)  Petitioner claims that his trial counsel properly objected to the testimony, but should have moved for a mistrial because simple exclusion of the evidence was not sufficient to rehabilitate his credibility in the eyes of the jury.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To

---

[3]Petitioner's second claim of ineffective assistance of counsel was deemed waived by the Michigan Court of Appeals because it was not raised in his statement of questions presented.  As a result, Petitioner's claim of ineffective assistance of counsel was not reviewed by the court of appeals and is procedurally defaulted.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004).  However, as previously discussed, the Court may proceed to the merits when the procedural default analysis adds nothing but complexity to the case.  *See Hudson*, 351 F.3d at 216.

establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

The Michigan Court of Appeals' decision on Petitioner's first claim of ineffective assistance of counsel was not an unreasonable application of *Strickland*. Petitioner made the first reference at trial to his incarceration without being specifically prompted by defense counsel. Furthermore, Petitioner's own mention of his incarceration while awaiting trial did not result in a fundamentally unfair outcome. Petitioner, therefore, was not prejudiced by counsel's failure to make an objection or to request a curative instruction. "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient

showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. Because Petitioner cannot establish prejudice resulting from counsel's conduct, his first claim of ineffective assistance of counsel must fail.

   With regard to Petitioner's second claim of ineffective assistance of counsel, trial counsel's failure to move for a mistrial clearly did not fall below an objective standard of reasonableness.[4] "[N]ot every instance of mention before a jury of some inappropriate subject matter warrants a mistrial." *People v. Griffin*, 597 N.W.2d 176, 182-83 (1999), overruled in part on other grounds, *People v. Thompson*, 730 N.W.2d 708 (2007). Under Michigan law, only an irregularity that is prejudicial to the rights of the defendant and impairs the fairness of the trial is grounds for a mistrial. *People v. Alter*, 659 N.W.2d 667, 674 (Mich. Ct. App. 2003). The two instances cited by Petitioner were isolated and minor in the context of Petitioner's trial. Petitioner concedes that trial counsel made appropriate objections that were sustained by the trial court. The complained of testimony clearly was not sufficiently prejudicial to support a motion for mistrial. Defense counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004). Petitioner, therefore, fails to establish a claim of ineffective assistance of counsel.

---

[4]Where the state court clearly did not address the merits of a claim, the habeas court must conduct *de novo* review. *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

C. **Ground II: Failure to Instruct on Lesser Offense of Assault with a Dangerous Weapon**

In his second ground for habeas corpus relief, Petitioner contends that the trial court erred by denying his request for an instruction on the lesser offense of assault with a dangerous weapon (otherwise known as felonious assault) with regard to the stabbing of Jeff Olsen.   The Michigan Court of Appeals rejected Petitioner's claim, stating:

> Defendant also argues that the trial court should have instructed the jury on the offense of felonious assault as a lesser included offense of assault with intent to do great bodily harm. However, as defendant acknowledges, felonious assault is not a necessarily a lesser-included offense of assault with intent to murder. Rather, it is a cognate lesser offense. See *People v Vinson*, 93 Mich App 483, 485-486; 287 NW2d 274 (1979). *Under People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002), instructions on cognate lesser offenses are not to be given to the jury. See MCL 768.32(1). Because we are required to follow *Cornell*, we must reject defendant's argument regarding this issue.

(MCOA Op., 3.)

The Sixth Circuit Court of Appeals, sitting en banc, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack."  *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc).  The *Bagby* Court held that failure to instruct on lesser-included offenses in a noncapital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure.  *Id.*; *accord Tegeler v. Renico*, 253 F. App'x 521, 524 (6th Cir. 2007); *Todd v. Stegal*, 40 F. App'x 25, 28-29 (6th Cir. 2002); *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001); *Samu v. Elo*, 14 F. App'x 477, 479 (6th Cir. 2001); *Williams v. Hofbauer*, 3 F. App'x 456, 458 (6th Cir. 2001).  Shortly after the Sixth Circuit decision

in *Bagby*, the Supreme Court emphasized that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief. *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983)). Instead, the only question on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 14 (1973)), *cited in Todd*, 40 F. App'x at 29. Here, there is no miscarriage of justice or fundamental defect in due process. As the state Court of Appeals made clear, Petitioner was not even entitled to the instruction under state law. Furthermore, no clearly established Supreme Court authority requires lesser-included offense instructions in non-capital cases. Thus, under the AEDPA, 28 U.S.C. § 2254(d)(1), this claim is not a basis for habeas relief. *Todd*, 40 F. App'x at 28 (citing *Estelle*, 502 U.S. at 71-72)).

D. **Ground III: Admission of "non-qualified" Expert Testimony**

Petitioner contends in Ground III that two witnesses gave expert testimony outside their areas of expertise, in violation of his due process rights. First, Petitioner claims that Dr. Guy Jeanblanc, the surgeon who treated Olsen's stab wounds, testified beyond the scope of his medical expertise that forceful use of the knife, rather than falling, caused the stab wounds and that Olsen's stab wounds lacked "hesitancy." (Tr. II, 177, 180.) Second, Petitioner argues that David Stephens testified beyond his expertise when he testified that the shape and location of the blood stain he found in the knife crevice caused him to conclude that at least the handle portion of the knife had been wiped or cleaned in some manner. (Tr. II, 213-14.) Petitioner contends that while Stephens described his credentials as a forensic scientist, he never disclosed specific training or expertise concerning stains on knives.

The Michigan Curt of Appeals found no error affecting Petitioner's substantial rights, stating:

> We also reject defendant's arguments regarding the admission of expert testimony. Under MRE 702, "a witness qualified as an expert by knowledge, skill, experience, training, or education may testify" regarding "scientific, technical, or other specialized knowledge" if it will assist the fact-finder in understanding the evidence or determining a fact in issue. Defendant challenges testimony offered by Dr. Guy Jeanblanc regarding the nature and extent of the wounds suffered by the stabbing victim. However, given Dr. Jeanblanc's extensive experience performing surgery on stab wounds, and indeed with making incisions himself as a surgeon, it is not plain that he lacked the requisite knowledge or skill to provide this testimony. As to the testimony of David Stephens regarding blood stains on the knife used in the stabbing, given his status as a forensic scientist, it is similarly not plain that he lacked the requisite knowledge or skill to provide that testimony.

(MCOA Op., 2.)

As previously discussed, state law issues are not subject to habeas review. *Estelle*, 502 U.S. at 67-68. A state-court determination concerning the admission of evidence can only be the basis for habeas corpus relief if it rendered the trial so "fundamentally unfair" that it deprives a defendant of due process. *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007); *Seymour*, 224 F.3d at 552. The Michigan Court of Appeals reasonably concluded that the complained-of testimony was reasonably related to the witnesses' areas of expertise. Furthermore, with regard to Stephen's testimony, Petitioner admitted at trial that he rinsed off the knife after he got home. (Tr. III, 168.) Petitioner, therefore, cannot show prejudice as a result of Stephen's testimony that at least some portion of the knife had been wiped or cleaned in some manner. Therefore, admission of the complained-of testimony clearly did not rise to the level of a due process violation.

E.    **Grounds IV, V and VI:  Sentence Scoring**

In his fourth and fifth grounds for habeas corpus relief, Petitioner argues that he is entitled to resentencing because the trial court improperly scored Prior Record Variables (PRVs) 2

- 27 -

and 5 of the sentencing guidelines. Specifically, Petitioner contends in Ground IV that the trial court improperly scored 30 points for PRV 2 based upon four low severity felony convictions. *See* MICH. COMP. LAWS § 777.52. Petitioner argues that the trial court counted two 1999 felony convictions that were based upon a crime that occurred in 1988 in violation of the "ten year gap rule" set forth in MICH. COMP. LAWS § 777.50. According to Petitioner, PRV 2 should have been scored 20 points based upon only two low severity felony convictions. Petitioner continues to argue in Ground V that the trial court improperly scored 15 points for PRV 5 based upon six prior misdemeanor convictions. *See* MICH. COMP. LAWS § 777.55. Petitioner contends that he should have received a score of zero because two of the misdemeanor convictions violated the ten-year gap rule and the remaining four were obtained without legal representation. In Ground VI, Petitioner claims that the trial court improperly scored Offense Variable (OV) 9 at ten points for two victims, rather than zero points for one victim, when Olsen was the only victim of the assault with intent to do great bodily harm. *See* MICH. COMP. LAWS § 777.39. Petitioner further asserts that his trial counsel was ineffective for failing to raise the preceding sentence scoring errors.

The Michigan Court of Appeals rejected Petitioner's claims as follows:

Defendant's argument regarding the scoring of PRV 2, and a portion of his argument regarding PRV 5, can only plausibly be understood as asserting that his prior convictions that were over ten years old at the time of sentencing should have been disregarded under the "ten-year gap rule" of MCL 777.50.3 This argument misapprehends MCL 777.50. While arguably somewhat cumbersome, the plain language of MCL 777.50(1) and (2) requires that a defendant's prior convictions be disregarded for purposes of scoring PRVs 1 through 5 only if they precede a ten-year period in which the defendant had no convictions, not merely because they are more than ten years old. In this case, the record reflects that no prior conviction preceding such a ten-year period in which defendant was free of convictions was considered by the trial court in scoring PRV 2 or PRV 5. It follows that trial counsel was not ineffective in failing to object to the scoring of PRV 5 on this basis. *Hawkins*, supra at 457.

Defendant also challenges the scoring of PRV 5 on the ground that it considered prior misdemeanor convictions for which he did not have or waive legal representation. An indigent defendant is constitutionally entitled to appointed counsel with regard to a misdemeanor charge if the defendant is actually imprisoned as a result of that conviction. *People v Reichenbach*, 459 Mich 109, 115-122; 587 NW2d 1 (1998). However, there is no record evidence as to whether defendant was indigent at the time of any of his prior convictions. Thus, defendant has not shown any plain error with regard to the trial court's consideration of those convictions. For this same reason, defendant has failed to meet his burden of establishing the factual predicate for his derivative claim of ineffective assistance of counsel. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

The trial court also did not plainly err in scoring ten points for OV 9 based on there being two victims. The record reflects that this scoring was based on the principal victim being stabbed by defendant while another victim was bitten by him when she attempted to secure his knife. MCL 777.39(2)(a), as in effect at the time of defendant's sentencing, directed that in scoring OV 9 a trial court should "[c]ount each person who was placed in danger of injury or loss of life as a victim." In *People v Morson*, 471 Mich 248, 261-262; 685 NW2d 203 (2004), our Supreme Court held that under that statutory language OV 9 was properly scored at ten points for two victims with regard to an armed robbery where, although only one person was robbed, another person "who was standing nearby and responded to [the robbery victim's] call for help was also 'placed in danger of injury or loss of life' by the armed robbery." It follows that the trial court did not plainly err in scoring ten points under OV 9 in this case because the female victim was placed in danger of injury (and indeed actually injured) as a result of the attack on the male victim. It follows that trial counsel was not ineffective in failing to make a futile objection to the scoring of OV 9. *Hawkins, supra* at 457.

(MCOA Op., 3-4) (footnotes omitted.)

Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief). Petitioner's claims concerning alleged violations of Michigan's ten-year gap rule in the scoring PRV

2 and 5 are purely a matter of state law. It is not the province of this Court to second-guess the Michigan Court of Appeals' interpretation of its own state law. *See Seymour*, 224 F.3d at 558 ("it is not for this court to question the state court's interpretation of its own law"); *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988); *Smith v. Sowders*, 848 F.2d 735, 739 (6th Cir. 1988). Consequently, these claims are not cognizable for purposes of habeas corpus review.

Likewise, Petitioner's claim in Ground VI concerning the scoring of OV 9 does not raise an issue of constitutional dimension. There is no constitutional right to individualized sentencing in non-capital cases. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (in a case holding that mitigating factors must be fully considered in death penalty cases, the Court "recognize[d] that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes."). Since Petitioner has no federal right to an individualized sentence, this ground presents an issue of state law only. Petitioner has not demonstrated that this is one of those rare instances where an alleged state-law sentencing error was so egregious that it led to a fundamentally unfair outcome. *See Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)).

Petitioner also claims in Ground V that the trial court improperly counted four uncounseled misdemeanors when it scored PRV 5. Petitioner also alleges that he informed his trial counsel about the issue during the sentencing hearing, but counsel failed to raise it before the trial court and was therefore ineffective. Petitioner therefore raises a substantive challenge to his sentence and a derivative Sixth Amendment challenge arising from counsel's failure to assert it. Petitioner's

substantive challenge alleges a claim of constitutional magnitude. Under clearly established Supreme Court authority, a sentencing court may not rely on an uncounseled misdemeanor conviction to enhance a sentence, if the conviction resulted in jail time. *See Nichols v. United States*, 511 U.S. 738 (1994). To invoke this principle, however, a criminal defendant bears the burden of showing both that he did not voluntarily waive counsel and that the misdemeanor conviction resulted in the imposition of a jail sentence. *Id.* at 746-47; *see Iowa v. Tovar*, 541 U.S. 77, 92-93 (2004) (in a collateral attack on an uncounseled misdemeanor conviction, it is the defendant's burden to prove that he did not intelligently waive counsel). On direct review, the state Court of Appeals acknowledged both the constitutional rule and the burden of proof placed on a defendant when making a collateral challenge to a previous misdemeanor conviction. (Op., 3). The court concluded that Petitioner had not met his burden, as the record was devoid of evidence showing that he was indigent at the time of his previous convictions and therefore entitled to appointed counsel. *Id.* The decision of the state Court of Appeals was based on an accurate statement of federal law and represents a reasonable application of the law to the facts of this case. To this day, Petitioner has not presented any evidence sufficient to undermine his misdemeanor convictions, which are presumed to be regular. *See Parke v. Raley*, 506 U.S. 20, 29-30 (1992). The decision of the Court of Appeals represents a reasonable application of federal principles and therefore passes review under AEDPA.

Petitioner asserts claims of ineffective assistance of trial counsel with regard to the alleged sentence scoring errors. Petitioner's claims of ineffective assistance of counsel must be evaluated under the two-part standard set forth in *Strickland, supra*. Petitioner contends that his trial counsel was ineffective for failing to raise an alleged violation of the statutory ten-year gap rule in scoring PRVs 2 and 5. However, under a plain reading of MICH. COMP. LAWS § 777.50, none of

Petitioner's prior felony or misdemeanor convictions violated the so-called ten-year gap rule. Counsel's failure to make a meritless or futile objection does not amount to constitutionally deficient performance. *See Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506; *United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000); *United States v. Perry*, 908 F.2d 56, 59-60 (6th Cir.1990). Because Petitioner fails to satisfy the first requirement of *Strickland*, his claim must fail. *See Campbell*, 364 F.3d at 730.

Similarly, counsel's failure to object to the trial court's scoring of OV 9 was not objectively unreasonable. As thoroughly explained by the Michigan Court of Appeals, the trial court was required to "[c]ount each person who was placed in danger of injury or loss of life as a victim." The trial record shows that both Olsen and Casey were placed in danger during the course of the stabbing incident. After Petitioner stabbed Olsen, Casey tried to wrestle the knife away from him. (Tr. II, 97; Tr. III, 89.) During the course of the struggle, Petitioner leaned over and bit Casey's left arm. (Tr. II, 98.) When Petitioner won possession of the knife, he backed away a step or two, said "Back off, bitch," and ran away. (Tr. II, 99-100.) In light of the evidence that Casey was placed in danger of injury, and was actually injured, during the struggle with Petitioner for the knife, any objection that trial counsel might have made to the scoring of OV 9 would have been futile. *See Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506; *Steverson*, 230 F.3d at 225; *Perry*, 908 F.2d at 59-60. Thus, Petitioner's claim of ineffective assistance concerning the scoring of OV 9 also must fail.

Petitioner further contends that defense counsel was ineffective for failing to object to the trial court's use of four uncounseled misdemeanor convictions in scoring PRV 5. Petitioner has not shown that these convictions suffered from any infirmity or that reliance on them was

objectionable.  Because Petitioner cannot show that he was prejudiced by counsel's failure to make an objection, he cannot sustain his claims of ineffective assistance of counsel.

F.    **Ground VII:  Application of *Blakely v. Washington***

Petitioner argues that the trial court judge violated his Sixth Amendment right to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt.  Petitioner bases his argument on the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. 296 (2004).  *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge.  Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant.  The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt.  *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term.  The maximum sentence is not determined by the trial judge, but is set by law.  *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8).  Only the minimum sentence is based on the applicable sentencing guideline range.  *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)).  The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing

system does not run afoul of *Blakely*. *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (affirming district court's dismissal of prisoner's claim under *Blakely* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007). Therefore, the state court's determination of Petitioner's claim was not contrary to federal law clearly established by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated: October 14, 2010          /s/  Joseph G. Scoville
                                 United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).